NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WELFED CATFISH, INC., Respondent.

No. 81–4275
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

May 6, 1982.

Elliott Moore, Deputy Assoc. Gen. Counsel, NLRB, Washington, D. C., for petitioner.

Clyde H. Jacobs, III, New Orleans, La., for respondent.

Before RUBIN, SAM D. JOHNSON and GARWOOD, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

This is an application for enforcement of an order requiring an employer to cease and desist from refusing to bargain with a union certified by the National Labor Relations Board ("the Board") as its employees' bargaining agent. The primary issue is whether substantial evidence supports both the Board's conclusion that, despite a supervisor's prounion activities, the election that resulted in certification of the union as the collective bargaining agent should not be set aside and the Board's concomitant order requiring the employer to bargain with the union.[1] After considering the record as a whole, and finding that the order is amply supported by the evidence, we grant enforcement.

## I

The employer, Welfed Catfish, Inc. ("Welfed"), contends that prounion conduct by one of its supervisors, Gus Lampkin,[2] coerced its employees and thus invalidated the election by which the union was chosen. Lampkin's involvement, as described by Welfed, with the omission only of conclusory comments, began on May 4, 1980, when two fellow employees visited him at his house one day and solicited his support for the union. He signed a union authorization card and accepted approximately ten cards to be signed by other employees. He signed his name on the backs of these cards. Later that day two other employees, one of whom was a cousin of Lampkin's wife, came to his house. He gave each of them a card, which each signed.

On May 7, Lampkin attended a union meeting at which about forty employees were present. Four of the employees present, including Lampkin, had been given authorization cards so they could communicate with other employees to "ask them if they wanted to join the union and to let them sign the cards." At the meeting Lampkin passed out a few cards.

On May 18, a Sunday, Lampkin attended another union meeting. About forty to fifty employees were present, and Lampkin signed the attendance roster with the other employees. One of the union organizers asked for a show of hands by anybody who had talked with any of the people running the plant. Lampkin raised his hand. The people running the meeting asked him to remain after the meeting. Lampkin did and gave "the union man" a statement about a conversation Lampkin had with a company official.

On May 28, Welfed officials learned of Lampkin's activities. He was summoned to the office of the plant superintendent who told him emphatically that, because Lampkin was a supervisor, Lampkin could not support the union at all or vote in the

---

1. Our enforcement of the Board's order requiring the employer to bargain with the union depends on the validity of the Board's earlier decision certifying the union after the election. *E.g., NLRB v. Klingler Elec. Corp.*, 656 F.2d 76, 85 (5th Cir. 1981).

2. The NLRB concedes that Lampkin was a "statutory supervisor," but contends that he was only "a low-level supervisor," and that,

therefore, "employees would be far less likely to feel coerced by" his conduct. Welfed criticizes this contention, arguing that Lampkin "exercised substantial and extensive authority," and that the exact "level" of his supervisory position is thus irrelevant. For the purpose of this opinion, we assume, arguendo, that Welfed's position is correct.

election. At a supervisors' meeting on June 2, which Lampkin attended, this point was reiterated. Thereafter Lampkin showed no further support for the union. He asked a union organizer to return the statement he had made on May 18. After Lampkin received the statement, he destroyed it. On June 24, the election was held, and the union won.

Welfed contested the election, but was denied relief,[3] and the union was certified as the exclusive representative of Welfed's employees. After the union sought to bargain with Welfed, and Welfed refused, the union charged Welfed with committing an unfair labor practice. 29 U.S.C. § 158(a)(5) (1976).[4] The Board's Acting Regional Director issued a complaint against Welfed. The Board then granted summary judgment against Welfed, stating

> [a]ll issues raised by [Welfed] in this proceeding were or could have been litigated in the prior representation proceeding, and [Welfed] does not offer to adduce at a hearing any newly discovered or previously unavailable evidence, nor does it allege that any special circumstances exist herein which would require the Board to reexamine the decision made in the representation proceeding.[5]

Welfed objects to this grant of summary judgment. It contends that the election should be set aside because Lampkin's prounion conduct coerced its employees and thereby destroyed the "laboratory conditions" required in a union representation election. *E.g., NLRB v. Decatur Transfer & Storage, Inc.*, 430 F.2d 763, 764 (5th Cir. 1970); *General Shoe Corp.*, 77 *N.L.R.B.* 124, 127 (1948). Alternatively, Welfed urges

that the evidence requires that it at least be granted a hearing on its contentions. In opposition, the Board argues, *inter alia*, that Welfed cannot object to the election because Welfed learned of Lampkin's prounion conduct but did nothing to dispel the effect that conduct had, or might have had, on Welfed's employees.[6]

## II

■ Although we review the Board's findings only to determine whether on the record as a whole they are supported by substantial evidence, we do not act as automatons, nor may we abdicate our judicial function. The Board's findings deserve respect but do not command submission. We must make our own assessment of the reasonableness and fairness of the Board's conclusions. *NLRB v. Brown*, 380 U.S. 278, 290-92, 85 S.Ct. 980, 987–89, 13 L.Ed.2d 839, 847-850 (1965); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456, 467 (1951); *Dow Chem. Co. v. NLRB*, 660 F.2d 637, 643 (5th Cir. 1981). Yet we recognize that Congress has vested the Board with a wide degree of discretion in matters relating to representation proceedings. *NLRB v. A. J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322, 325 (1946); *NLRB v. Gulf States Canners, Inc.*, 634 F.2d 215, 216 (5th Cir.) (per curiam), *cert. denied*, 452 U.S. 906, 101 S.Ct. 3033, 69 L.Ed.2d 407 (1981); *NLRB v. Osborn Transp., Inc.*, 589 F.2d 1275, 1279 (5th Cir. 1979).[7]

■ The longstanding rule is that an employer may not stand idly by after learn-

---

**3.** The Board found that none of the conduct or comments of Lampkin was threatening or coercive and that none of his conduct was so marked or inordinate as to lead employees to fear possible retribution if they rejected the union.

**4.** The procedural posture of this case is hardly novel. "A refusal to bargain is a common method for challenging the Board's certification of a union ...." *NLRB v. Smith Indus.*, 403 F.2d 889, 891 (5th Cir. 1968); *accord, NLRB v. Air Control Prods.*, 335 F.2d 245, 247 & n.1 (5th Cir. 1964) (collecting cases).

**5.** The Board's decision is reported at 255 *N.L.R.B.* —— (1981) (No. 40).

**6.** The Board argues, and Welfed responds to, several other points in this appeal. We need not discuss these points, however, because we hold against Welfed on the threshold issue of its failure to take steps to dispel the effect of Lampkin's prounion conduct.

**7.** *See NLRB v. L. B. Priester & Son*, 669 F.2d 355, 359 (5th Cir. 1982).

ing that one of its supervisors has engaged in prounion or antiunion conduct before a representation election. Rather, the employer must take steps to dissipate the possible harmful effect of the supervisor's conduct on its employees. *NLRB v. Air Control Prods.*, 335 F.2d 245, 250 (5th Cir. 1964). If the employer fails to take such steps, it cannot raise the supervisor's alleged misconduct as a ground for setting aside the election; its inaction estops it from doing so. "[W]hen an employer knows of advocacy of a union by supervisory personnel and takes no steps to dissipate its effect, such conduct cannot be used as a basis for setting aside the election." *NLRB v. Dobbs House, Inc.*, 613 F.2d 1254, 1257 (5th Cir. 1980).[8]

■ Welfed recognizes this principle but advances three arguments[9] to avoid its operation. Welfed first argues that it did not stand idly by, but did in fact tell Lampkin and other supervisors not to engage in advocacy before the election. Such action, however, fails to satisfy the employer's duty to dissipate the effect of a supervisor's advocacy. It communicates nothing to the employees and leaves the impact of the supervisor's remarks unsoftened. The employer must "take appropriate steps to disabuse its *employees* of the effect of" a supervisor's advocacy. Hadley Mfg. Corp., 106 *N.L.R.B.* 620, 621 (1953) (emphasis added);[10] *cf.* E. I. DuPont de Nemours & Co., 81 *N.L.R.B.* 238, 240 (1949) (employer reprimanded antiunion advocates "in the pres-

ence of a group of workers"). Once Welfed learned of Lampkin's actions, it could not await the election results, without making any effort to dissipate any coercive effect Lampkin's conduct may have had, then use his activities to challenge the outcome if the vote proved unfavorable to Welfed. *Cf.* Camp Milling Co., 109 *N.L.R.B.* 471, 473 (1954). Because Welfed never communicated with its employees about Lampkin's alleged misconduct, its first argument must fail.

■ Welfed next argues that the union also stood idly by while benefiting from Lampkin's misconduct. Assuming that the facts support this argument, we deem it irrelevant, for Welfed, and not the union, is challenging the election; thus Welfed, and not the union, is trying to benefit from its own inaction. *Cf.* E. I. DuPont de Nemours & Co., 81 *N.L.R.B.* at 239 (union acquiescence in alleged election misconduct estops it from challenging election). Whether the union also had a duty and, if so, whether it also violated that duty[11] by doing nothing to disclaim the benefits of Lampkin's conduct is, therefore, immaterial.

■ Finally, Welfed asserts that public disavowal of Lampkin's conduct would have been futile because the coercive effects of that conduct had already taken effect and could not have been negated. But Welfed refers to no evidence that supports this assertion, and we have found none. Welfed had almost a month to take steps to negate

---

**8.** *Accord, NLRB v. Decatur Transfer & Storage, Inc.*, 430 F.2d at 764–65; *NLRB v. Lamar Elec. Membership Corp.*, 362 F.2d 505, 506–07 (5th Cir. 1966); *NLRB v. Air Control Prods.*, 335 F.2d at 250; *NLRB v. Manufacturer's Packaging Co.*, 645 F.2d 223, 226 (4th Cir. 1981); Skogrand-Buesing, Inc., 241 *N.L.R.B.* 292, 293 (1979); Tac Indus., Inc., 231 *N.L.R.B.* 554, 555 (1977); Talladega Cotton Factory, Inc., 91 *N.L.R.B.* 470, 471–72 (1950).

**9.** We decline to discuss a fourth argument, grounded on meaningless factual distinctions between this and other cases, because Welfed has not established the significance of these distinctions, and we discern none.

**10.** In *Hadley Manufacturing Corporation*, the employer learned of a supervisor's advocacy and told her to stop. The Board held that this action failed to dissipate the effect of the supervisor's advocacy, because "[t]he Employer did not notify *the employees* that it disavowed [the supervisor's] alleged coercive conduct." 106 *N.L.R.B.* at 622 (emphasis added).

**11.** We do not hold or suggest that such a duty exists. Welfed merely assumes that it does, but cites no authority for its assumption. The employer, and not the union, has "operational responsibility" for supervisors. *NLRB v. Air Control Prods.*, 335 F.2d at 250.

Lampkin's conduct. It has failed to prove that, during this lengthy period, it would have been unable to dissipate the effect of Lampkin's conduct among its employees. *See* Skogrand-Buesing, Inc., 241 *N.L.R.B.* 292 (1979) (five days sufficient to correct supervisor's coercive threat).[12]

 Because Welfed stood idly by after it learned that Lampkin had engaged in prounion conduct, it is unnecessary for us to discuss the other arguments raised in this appeal, which deal with the alleged coercive effect of that conduct. Even if the conduct pressed upon the employees, the employer should have acted before the election instead of awaiting its results before acting. Talladega Cotton Factory, Inc., 91 *N.L.R.B.* 470, 472 (1950).[13]

Because substantial evidence supports both the Board's conclusion that the representation election should not be set aside and its order requiring Welfed to bargain with the union, we ENFORCE the Board's order.

---

**12.** *Accord,* Tac Indus., Inc., 231 *N.L.R.B.* at 555 (three days sufficient to correct advocacy by members of employer's board of directors) ("No showing was offered or made to establish that this was not a reasonable period of time for the Employer to disavow the activities of [the directors] and take appropriate steps to dissipate their alleged objectionable conduct."); Hadley Mfg. Corp., 106 *N.L.R.B.* at 621 (three months); Underwood Mach. Co., 80 *N.L.R.B.* 1264, 1266 (1948) (two months), *enforced,* 179 F.2d 118, 121 (1st Cir. 1949); *cf. NLRB v. Decatur Transfer & Storage, Inc.,* 430 F.2d at 765 n.5 (employer alleged that it did not learn of supervisor's prounion conduct until the night before the election).

**13.** *Accord,* E. I. DuPont de Nemours & Co., 81 *N.L.R.B.* at 239.

Without determining whether or not the activity here objected to constituted interference with the election, on the facts in this particular case we believe that, in view of the [complainant's] past acquiescence, it may not now ask [that] the election be set aside because of this activity. We need not, nor do we here, decide what view we would take of similar activity under different circumstances.

*Id.* (footnote omitted).